In the Interest of H.V., a Minor.

Appeal of L.V., mother.

In the Interest of C.L., a Minor.

Appeal of L.V., mother.

In the Interest of J.W., a Minor.

Appeal of L.V., mother.

Superior Court of Pennsylvania.

Argued Oct. 26, 2011.
Filed Jan. 30, 2012.

Joshua M. Autry, Camp Hill, for appellant.

John P. Stengel, Lancaster, for Guardian Ad Litem, appellee.

David E. Alspach, Lancaster, for Lancaster Children and Youth, appellee.

BEFORE: DONOHUE, OLSON and STRASSBURGER*, JJ.

OPINION BY STRASSBURGER, J.:

L.V. (Mother) appeals from the orders dated March 31, 2011, by which the trial court granted the petition filed by Lancaster County Children and Youth Social Service Agency (CYS) appointing the paternal grandparent of each child, H.V., J.W., and C.L., as a Permanent Legal Custodian (PLC).[1] After careful review, we reverse.

---

* Retired Senior Judge assigned to the Superior Court.

1. The following summary of the subsidized PLC program applies:

Because of the complex nature of this family situation, we provide a short overview. Mother is the biological mother of four children, each of whom has a different biological father. The oldest child, H.V., was born in 1999, and is the biological child of Mother and A.V. H.V. has been living with her paternal grandmother and paternal step-grandfather, R.C. and J.C., since her placement.[2] Second, J.W. is the biological child of Mother and R.W. J.W. was born in 2001 and has been living with her paternal grandmother, S.W., since November 12, 2008.[3] The third child, C.L., born in 2005, is the biological child of Mother and M.L. C.L. is currently living with his paternal grandmother and paternal step-grandfather, W.R. and M.R.[4] Finally, Mother and current boyfriend/fiancé, E.F., are the biological parents of a child born in 2011. That child is not dependent and is not involved in this case.

On August 25, 2005, CYS received a referral regarding this family, which at the time consisted of Mother and M.L. (who were unmarried) and two children, H.V. and J.W. Mother was pregnant with C.L. There was allegedly an instance of domestic violence between Mother and M.L. which precipitated the referral. The record does not indicate what, if any, services the family received at that time.

On August 10, 2006, CYS received another referral regarding a domestic dispute between Mother and M.L. (by this point, Mother had given birth to C.L.). The family was accepted for services and both Mother and M.L. signed Family Service Plans (FSPs) on October 19, 2006. At that point, Mother and M.L. were living separately. On March 6, 2007, Mother obtained a temporary Protection From Abuse (PFA) order against M.L., because M.L. had hit her and had been acting violently toward her during the prior 18 months. Mother withdrew the PFA petition shortly afterwards.

On September 17, 2007, CYS filed petitions for legal custody of the children due to the ongoing domestic violence between M.L. and Mother. That petition alleged that M.L. had refused to cooperate with his FSP by refusing to undergo drug testing when there was reason to believe he was using drugs and alcohol. CYS had also confirmed that M.L. had moved back into Mother's residence, although the FSP allowed for no unsupervised contact between M.L. and the children. Additionally, Mother had refused services from CYS, including domestic violence education and a parenting program. On September 19, 2007, the trial court granted legal custody of the children to CYS, but allowed Mother to retain physical custody. As of February 12, 2008, CYS and the trial court determined that Mother had only minimal compliance with her FSP objectives. At

In 2001, Pennsylvania created a subsidy program, SPLC, which provides financial support for families willing to become permanent legal custodians pursuant to section 6351(f.1)(3). SPLC transfers permanent legal custody to the [dependent] child's legal custodian without requiring the termination of natural parental rights. When deemed appropriate, the trial court has the power to permit continued visitation by the [dependent] child's natural parents. To be eligible for SPLC, the legal custodian must meet all of the requirements for foster parenthood, submit to an annual eligibility evaluation, and have the ability to provide for the child without court supervision.

*In re B.S.*, 861 A.2d 974, 977 (Pa.Super.2004).

2. A.V. is not considered a resource for H.V., and has not had contact with the agency since 2009. N.T., 3/13/2011, at 11.

3. R.W. has had no contact with CYS or the child through the course of these proceedings. N.T., 3/13/2011, at 11.

4. M.L. does have supervised visitation with C.L.

the next review hearing, on July 18, 2008, CYS and the trial court determined that Mother had progressed to moderate compliance with her FSP objectives.

On September 25, 2008, CYS was notified of a domestic disturbance at Mother's home between M.L. and Mother. By the time police arrived at Mother's home, M.L. was no longer there and Mother denied that M.L. had ever been there. M.L. had been ordered to have no contact with H.V. and J.W. and only supervised contact with C.L.

On October 6, 2008, the children were interviewed at school and told the interviewers that M.L. comes into Mother's home with Mother's permission. M.L. reported to police that he and Mother were in an "on again, off again" relationship. On October 7, 2008, when a CYS caseworker arrived at Mother's home, Mother became angry and slammed the door in the caseworker's face. Because of this situation, CYS filed a shelter care petition, which was granted by the trial court, for all three children. All three children were removed from Mother's home and placed in the kinship foster care placements where they currently reside.

By February 27, 2009, Mother had substantially complied with her permanency plan and FSP. She provided bank statements showing adequate financial resources, provided a utility bill, and had the ability to rent a larger apartment to accommodate the children when they returned. Furthermore, she maintained employment and has received counseling. By July 17, 2009, Mother had completely complied with her FSP by obtaining suitable housing and completing a parenting class.

However, by November of 2009, CYS had concerns regarding contact between Mother and M.L. On November 13, 2009, M.L. and Mother had a confrontation in a bar which resulted in Mother being told to leave the bar. Mother claims she attempted to avoid contact with M.L., but M.L. threw her across the bar. Then, on December 27, 2009, CYS learned that Mother was involved in an altercation with several unknown females. Mother was charged with disorderly conduct for this incident. Mother did not report either of these incidents to CYS. Additionally, CYS learned that Mother was engaged to be married to E.F.; however, Mother refused to provide any information about E.F. for the purpose of conducting a background check.

The trial court held review hearings on March 30 and April 9, 2010. On April 14, 2010, the trial court concluded that Mother had not completed the domestic violence goal because there had been repeated instances of domestic violence between M.L. and Mother and they had purposely hidden those incidents from the caseworker. The trial court also concluded that Mother's new boyfriend, E.F., has a lengthy criminal record for driving under the influence of alcohol (DUI) and driving with a suspended license (DUS).

The trial court held another hearing on August 6, 2010. Mother had begun attending a domestic violence group, but CYS continued to be concerned about Mother's romantic relationships, particularly because she was not straightforward with CYS. After another hearing on October 18, 2010, the trial court concluded that Mother still had achieved moderate compliance. However, it was also learned that E.F. had been incarcerated recently for public drunkenness and disorderly conduct, but Mother was not concerned about that and was less than forthcoming with CYS.

After hearings on March 28, 2011 and March 30, 2011, the trial court changed the goal for all three children to PLC with their respective paternal grandparents.

At those hearings, the trial court heard testimony from Nicole Schwartz (Schwartz), the caseworker assigned to this family. Schwartz testified that on March 14, 2011, Mother contacted a caseworker and indicated that she was currently pregnant and due on September 1, 2011. N.T., 3/28/2011, at 5. It was the caseworker's understanding that E.F. was the father of that child. *Id.* at 6. Schwartz testified that Mother reports that E.F. does not live with her, although he "often spends the night at her home." *Id.* The caseworker had also found E.F. at Mother's home when she visited on September 15, October 21, and December 2, 2010. *Id.* The trial court admitted evidence regarding E.F.'s past criminal history, which includes guilty pleas to DUI and DUS. *Id.* at 47.

Schwartz also testified that Mother's therapy had stopped, as it had gone "as far as it could go" because Mother has a "wall." *Id.* at 7. Schwartz stated that "[f]rom what the counselor had explained, she expressed her belief that if [Mother] was [*sic*] to voluntarily participate in counseling, that [*sic*] she might possibly be more open, but that because it was [a CYS] requirement, that [*sic*] she seemed not as receptive." *Id.* at 41.

Schwartz further testified that Mother's visits with the children, although not supervised, were monitored and were going generally well. *Id.* at 8–10. Mother also testified at this hearing. Mother testified that she was in love with E.F. and pregnant with his child. *Id.* at 51. She further testified that she intends to maintain her relationship with him; she was aware of his criminal history; and, she does not believe he would be a threat to her children. *Id.* at 51–52.

Mother also expressed concerns about C.L.'s placement. *Id.* at 53. C.L.'s paternal grandmother and step-grandfather, W.R. and M.R., do not have a good relationship with Mother. Mother testified that she does not "feel they want [C.L.] to have a relationship with [Mother] or her family." *Id.* at 53. She testified that they do not bring C.L. to the birthday parties of her other children, who are C.L.'s half-sisters. *Id.*

Mother also testified at the March 30, 2011 hearing. At that hearing, she testified that she was currently living in a three-bedroom townhouse. She testified about her contentious relationships with M.L., M.R., and W.R. She also testified that her parents and sister would help her if she regained custody of her children.

On March 31, 2011, the trial court entered orders for each child providing that each child would live with his or her respective paternal grandparents, as PLCs, and would have visitation with Mother and each other during certain times.

On April 29, 2011, Mother [5] filed timely notices of appeal to the Superior Court, and both Mother and the trial court complied with Pa.R.A.P.1925.[6]

On appeal, Mother presents three issues for our review.

A. Whether the trial court erred in granting legal and primary custody of [Mother's] three children to their separate and respective paternal grandparents where [Mother] has complied with her permanency plan, the reason for original placement—a threat to the children by [M.L.]—no longer exists, and where the children want to be reunited with their mother and with each other?

---

**5.** None of the Fathers filed a notice of appeal.

**6.** These appeals were consolidated *sua sponte* by this Court.

B. Whether the trial court erred in finding that the placement of the children continues to be necessary and appropriate where the reason for original placement—a threat to the children by [M.L.]—no longer exists?

C. Whether the trial court erred in changing the goal for the children from reunification, and in failing to order speedy reunification for the children with [Mother] and each other, where [Mother] has complied with her permanency plan, the reason for original placement—a threat to the children by [M.L.]—no longer exists, and where the children want to be reunited with their mother and each other?

Mother's Brief at 12.

 Our standard of review from an order granting PLC is abuse of discretion.

When reviewing such a decision[,] we are bound by the facts as found by the trial court unless they are not supported in the record. Furthermore, in a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interest and not those of his or her parents.

At each review hearing concerning a child who has been adjudicated dependent and removed from the parental home, the trial court must consider: the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

These statutory mandates clearly place the trial court's focus on the best interests of the child.

In addition[, a]lthough bound by the facts as found by the trial court and supported by the record, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for an abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and the witnesses.

*In re K.J.*, 27 A.3d 236, 241 (Pa.Super.2011) (internal citations omitted).

 On appeal, Mother raises three issues, all of which focus on the fact that the conditions leading to the initial placement of the children have been alleviated. Mother contends that she *"has* completed her permanency plan and has successfully alleviated the circumstances that allegedly necessitated the children's placement, *i.e.,* the removal of [M.L.] from the family home." Mother Brief's at 29 (emphasis in original).

The trial court did not address Mother's issues specifically; rather, the trial court focused on the fact that Mother was not immediately ready to parent these children and her past and current behavior indicates an overall lack of interest in parenting these children.

The [trial court] considered all of the above-cited elements and decided that reunification is not a realistic goal for these children at this time. Mother's compliance with her plan is far from complete, pregnant as she is and living with a man with a long criminal history. The [trial court] cannot believe that prolonging the current difficult situation which has no end in sight will serve the children's best interests.... It is [the trial court's] opinion that Mother has run out of time. If she was on the cusp of immediate success of providing an appropriate home for her children, the [trial court] would have the option of stretching the available time to allow her to finish her plan. But success does not appear to be near. Mother has spent the time of the children's placement ignoring those portions of her Plan which interfere with her personal preferences. She continued to have contact with and engage in violent behavior with [M.L.]. She has taken much too lightly the danger of the children viewing their parents acting violently. She has taken much too lightly her parental duty to protect [H.V.], [J.W.], and [C.L.], both physically and psychologically. She fails to understand the scope of her problem and the effect of her poor judgment and decision-making. She completed her domestic violence counseling and mental health goal only by the last hearing. She has had relationships with men with problematic histories without informing [CYS]. As of the last hearing before [the trial court], she disclosed that she is pregnant to a man with an extensive criminal history who has not been assessed by [CYS] because she refused to inform [CYS]. Her behavior shows that her personal, social and romantic needs are clearly more important to her than the welfare of her children. Throughout this case, the [trial court] found Mother not to be credible in her testimony or disclosures. [The trial court] therefore believes that the goal of reunification for these children must be changed so that they have an appropriate family to live with.

\* \* \*

It is fortunate that in this case each child has available a grandparent(s) who is available to provide the stability, consistency, love, support and guidance they need. The court appreciates that these children, while happy with their grandparents, would prefer to be with their mother. [The trial court] cannot permit that in this situation.

Trial Court Opinion, 5/27/2011, at 8–10.

For the following reasons, our careful review of the record does not support the trial court's ultimate conclusion. We disagree with the trial court that PLC is in the best interest of the children.

First, we agree with Mother that she has alleviated the circumstances which led to her children's placement—M.L. is no longer a threat to Mother or her family. The only reason they were removed from the home was because of the entrance of M.L. into Mother's life. There was no allegation of abuse against the children; rather, CYS was appropriately concerned about the children living in a house where abuse and violence toward Mother occurred. At the hearing, Schwartz testified that she believes there has not been contact between M.L. and Mother in "about a year." N.T., 3/28/2011, at 28. Thus, the abusive situation no longer exists—M.L. is no longer a part of Mother's life in a way that would affect these children.

■ Furthermore, the trial court erred when it failed to consider the bond between Mother, her children, and each other. "Bonding between the child and his or her biological parents and foster parents is

a factor to be considered in determining the child's best interests." *In re A.K.*, 936 A.2d 528, 536 (Pa.Super.2007). Mother's home was the only home these children knew from their birth through 2008. In other words, they spent the first nine, seven, and three years of their lives living with both Mother and each other.

■ Additionally, the record indicates that H.V. and J.W. want to be returned to Mother and also live with each other. N.T., 3/28/2010, at 29. "[T]he policy in Pennsylvania is to permit siblings to be raised together, whenever possible.... Absent compelling reasons to separate siblings, they should be reared in the same household to permit the continuity and stability necessary for a young child's development. This policy does not distinguish between half-siblings and siblings who share both biological parents." *Johns v. Cioci*, 865 A.2d 931, 942 (Pa.Super.2004) (internal quotations and citations omitted).

However, the trial court conducted no analysis of the bonding between the children and their grandparents, or the effect of the separation of the siblings. Nor was there any testimony from the grandparents at any time. For H.V., the only information of record regarding the grandparents is a letter written on October 5, 2009 from J.C. to the trial court. In that letter, J.C. wrote, "[we] feel [H.V. and J.W.] could be reunited with [Mother] provided a safe environment is present." Letter from J.C. to trial court, 10/5/2009. As to J.W., there is a "Resource Parent Reporting Form" dated October 13, 2009, where her grandmother writes, "As of now I feel like the girls should be with their mother at this stage of their life.... There was never a problem with [H.V. and J.W.] (that I am aware of)." Accordingly, the competent evidence of record did not indicate an appropriate bonding analysis in consideration of the best interests of the children.

We are also troubled with the trial court's position that Mother is unable to parent her children "pregnant as she is and living with a man with a long criminal history." Trial Court Opinion, 5/31/2011, at 8. As indicated at oral argument, the child born to Mother and E.F. has not been adjudicated dependent. To the extent CYS is concerned that Mother's relationship with E.F. is wrought with the same problems she had with M.L., that conclusion is not supported by the record. While it is true that E.F. has a criminal history, that history relates solely to issues with DUI and DUS. The record does not support the trial court's inference that Mother's relationship with E.F. poses a threat to the children in any way.

We also point out some particular issues only related to C.L. C.L. is in a some what different position than his older sisters, because he will continue to have a relationship with M.L., his biological father. Furthermore, the record indicates there is a contentious relationship between M.L., Mother, and the grandparents. Mother testified that M.L. has gotten into fights with his parents. N.T., 3/30/2011, at 109. M.L. testified that in December 2008, he "shoved" his mother during an argument. *Id.* at 27. In a lengthy October 7, 2009 letter to the trial court, M.R. and W.R. informed the trial court of their many opinions of Mother, M.L., and their parenting skills. The letter asserts that W.R., not Mother, was the first person to hold C.L. when he was born and "Mother did not seem interested or was too exhausted." The letter also states that Mother referred to C.L. as a "bastard" and a "monster" and never followed up with a doctor about the insertion of tubes into his ears. The letter goes on to comment about the relationship between Mother and M.L., calling it a

"love-hate relationship." The letter also accuses Mother of lying to the Domestic Violence Legal Clinic to get the PFA against M.L., which was why she later withdrew it. The letter went on to praise M.L.'s parenting skills, while accusing Mother of sabotaging M.L.'s efforts.

The trial court was concerned enough about this relationship that it did not follow the CYS recommendation, which was to give the grandparents complete discretion with regard to visitation between Mother and C.L. Instead, the trial court provided for specific visitation between Mother and C.L. in its custody order. *See* N.T., 3/28/2011, at 30–31. Specifically, the trial court stated, "I am not going to permit the grandparents to have that kind of discretion that's not going to allow [the relationship between Mother and C.L.] to continue." *Id.* at 69. We agree with the trial court's concern, but find it troubling that the trial court did not require more detailed testimony about these relationships prior to granting the grandparents PLC.

For the reasons outlined above, we reverse the trial court's order changing the goal to PLC, and we reinstate the goal of reunification.

Order reversed. Goal of reunification reinstated. Jurisdiction relinquished.