J-S53045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.K., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.P. | |
| | No. 843 WDA 2014 |

Appeal from the Order April 10, 2014
in the Court of Common Pleas of Indiana County
Civil Division at No.: CP-32-DP-45-2012

BEFORE: DONOHUE, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED OCTOBER 07, 2014**

C.P. ("Mother"), the mother of the subject dependent child, A.K. ("Child"), born in July of 2000, appeals from the permanency review order dated and entered on April 10, 2014, in the Indiana County Court of Common Pleas, Juvenile Court Division, changing Child's permanency placement goal from reunification to Permanent Legal Custody ("PLC"),[1] pursuant to Section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f). In its order, the trial court further directed that legal and physical custody of

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] PLC is a placement option under the Juvenile Act that places custody of a dependent child in a custodian, yet does not terminate the parents' parental rights. **See In re B.S.**, 861 A.2d 974, 977 (Pa. Super. 2004). In such a scenario, the parents may still have visitation with their child if deemed appropriate by the trial court. **See id.**

Child shall remain with the Indiana County Children and Youth Services Agency ("CYS"), and that Child shall remain in foster care.[2]  We affirm.

The trial court related the relevant facts and procedural history of this case as follows:

> [Mother and Father are the parents of Child].
>
> On August 23, 2012, Father filed a Petition for Emergency Custody [].  Father requested custody based on Mother's incarceration for alcohol/drug related offenses.  At the time, Child was in the care of Mother's boyfriend, [T.F.] ("Boyfriend").  Father's petition alleged that Boyfriend had enumerated charges and/or convictions under 23 Pa.C.S.A. § 5329.  A proceeding occurred on August 29, 2012.  A representative of [CYS] was present[,] as [CYS] was providing general protective services because of truancy.  As a result of the proceeding, it was determined that Father also had an enumerated conviction from the [S]tate of Michigan, and due to Mother's incarceration, and Father and Boyfriend's enumerated convictions, custody was temporarily awarded to the maternal grandfather, [D.P. ("Maternal Grandfather")], and the maternal aunt, [C.P. ("Maternal Aunt")].  [CYS] assisted the [trial c]ourt in arranging this placement.
>
> A continued special relief hearing occurred on October 12, 2012.  Mother, who had been released from jail, appeared with Boyfriend.  Father also appeared.  Mother, Boyfriend and Father were not placement options because of their enumerated convictions.  [M]aternal [G]randfather had recently died.  Concerns were raised about [M]aternal [A]unt's care of the Child and she no longer wanted the Child in her custody.  At the conclusion of the proceeding, Mother and Father signed a Voluntary Placement Agreement for foster care and the [trial c]ourt transferred jurisdiction of the custody case to juvenile court.  A Dependency Petition was filed by [CYS] on October 23, 2012.  Grounds under 42 Pa.C.S.A. § 6302(a)(1) were alleged.

_____

[2] A.K. ("Father") has not appealed the order changing Child's permanency placement goal to PLC, nor is he a party to this appeal.

- 2 -

An Adjudication and Disposition hearing occurred on November 8, 2012 and the Child was placed in the temporary legal custody of [CYS]. Placement was in foster care. The current permanent placement goal was return to parent. The Initial Permanency Review occurred on February 7, 2013. Mother was found to be in full compliance with the permanency plan and completed her initial treatment group at the Open Door. She was referred to a relapse prevention group. Mother's progress was moderate because she tested positive for Oxycontin on January 30, 2013. Boyfriend also tested positive for Oxycontin (which he was prescribed) and cocaine.

Mother continued with full compliance at the Permanency Review proceeding on June 27, 2013. However, her progress remained at the moderate level due to another positive drug test on February 7, 2013. At the September 26, 2013 Permanency Review hearing, Mother was in full compliance. She regularly attended the Open Door and began working with Justice Works, a human service agency. Her progress was rated as moderate because she had only recently started the program with Justice Works. Mother again achieved full compliance at the January 16, 2014 review. She completed intensive outpatient treatment on January 9, 2014 and started relapse prevention on January 14, 2014. Her progress was determined to be full because she passed all her drug screens and was consistent in working with Justice Works.

[CYS] filed a Motion for Permanency Review/Change of Goal on March 24, 2014. The request for change of goal was based on credible information that [CYS] received about the sale of drugs at Mother's home, which she shares with Boyfriend. During a meeting with [CYS], which occurred on January 30, 2014, Mother's explanation for what occurred did not match other information received by [CYS]. Father was not a placement option because of a change in his living circumstances. As a result, [CYS] requested a goal change to [PLC]. Adoption was ruled out because of the Child's close relationship with her Mother.

A Permanency Review/Change of Goal hearing occurred on April 10, 2014. Present was the [CYS] Solicitor, Mother and her court appointed counsel, Father, who participated by phone from Michigan, Father's court appointed counsel, and the Guardian ad Litem. The Child was interviewed *in camera*. Testimony was

- 3 -

received from [Mother, Mother's former husband, W.L. ("Ex-Husband"),[3] CYS caseworker Joseph Petruna, and Boyfriend's cousin, R.B. ("Boyfriend's Cousin")]. Following testimony, the [trial c]ourt approved the change of goal.

(Trial Court Opinion, 6/10/14, at 1-4 (footnote omitted)).

On May 13, 2014, Mother simultaneously filed a timely Notice of Appeal and a Concise Statement of Errors Complained of on Appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises two questions for our review:

> 1.    Did the trial court abuse its discretion by failing to give proper weight to Mother's testimony?
>
> 2.    Did the trial court abuse its discretion by granting a change of goal where Mother had been in full compliance with the permanency plan and where there was no evidence that Mother attempted to sell drugs?

(Mother's Brief at 6).

Our standard of review for an order granting a petition to change a dependent child's permanency placement goal to PLC is abuse of discretion.

> When reviewing such a decision[,] we are bound by the facts as found by the trial court unless they are not supported in the record. Furthermore, in a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interest and not those of his or her parents.
>
> At each review hearing concerning a child who has been adjudicated dependent and removed from the parental home,

_____

[3] Ex-Husband is the father of Mother's daughter, K.L. ("Daughter"), who is 18 years old, and Mother's son, M.L., who is 20 years old. (**See** N.T. Hearing, 4/10/14, at 5). When Mother and Ex-Husband divorced in 1997, Ex-Husband petitioned for and was granted primary physical and legal custody of their two children. (**See id.** at 6).

the trial court must consider: the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

These statutory mandates clearly place the trial court's focus on the best interests of the child.

In addition[, a]lthough bound by the facts as found by the trial court and supported by the record, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for an abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and the witnesses.

*In re H.V.*, 37 A.3d 588, 593 (Pa. Super. 2012) (citation omitted).

Section 6351(f) of the Juvenile Act prescribes the pertinent inquiries for the reviewing court as follows:

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for child.

- 5 -

> (3)    The extent of progress made toward alleviating the circumstances which necessitated the original placement.
>
> (4)    The appropriateness and feasibility of the current placement goal for the child.
>
> (5)    The likely date by which the placement goal for the child might be achieved.
>
> (6)    Whether the child is safe.

42 Pa.C.S.A. § 6351(f)(1)-(6).

Additionally, Section 6351(f.1)(3) of the Juvenile Act authorizes the trial court to grant a goal of PLC if the trial court decides that neither reunification nor adoption "is best suited to the child's safety, protection and physical, mental and moral welfare."  42 Pa.C.S.A. § 6351(f.1)(3).  In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary.  *See In re A.K.*, 936 A.2d 528, 532-33 (Pa. Super. 2007).  In contrast, in a termination of parental rights proceeding, the focus is on the conduct of the parents under 23 Pa.C.S.A. § 2511.  *See In re M.B.*, 674 A.2d 702, 705 (Pa. Super. 1996), *appeal denied*, 688 A.2d 172 (Pa. 1997). Finally, the court also must consider the bond between the child and his parents, foster parents, and siblings.  *See In re H.V.*, *supra* at 594-95.

In her first issue on appeal, Mother contends that the trial court committed an abuse of discretion in failing to accord proper weight to her testimony.  (*See* Mother's Brief, at 11).  We disagree.

It is well established that "[t]he trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony.   In carrying out these

responsibilities, the trial court is free to believe all, part, or none of the evidence." ***In re Adoption of R.J.S.***, 901 A.2d 502, 506 (Pa. Super. 2006) (internal citations omitted). So long as the trial court's findings are supported by competent evidence of record, this Court will not revisit the trial court's determinations regarding the credibility of witnesses. ***See In re K.C.***, 903 A.2d 12, 16 (Pa. Super. 2006).

In its Rule 1925(a) opinion, the trial court explained its reasoning for according less weight to Mother's testimony than that of the other witnesses, as follows:

> During the April 10, 2014 hearing[,] the [trial c]ourt heard testimony from [Ex-Husband], [CYS] caseworker[] Joseph Petruna, Mother, and Boyfriend's [C]ousin . . . .
>
> . . . [Ex-Husband] testified that[,] on January 9, 2014, he intercepted a text message from Mother to [Daughter]. The text message stated: "Hey Tom's guy brought over two new kinds of stuff he got sent from Colorado[,] purple halo and og [k]ush." [Ex-Husband] understood "purple halo" and "og [c]ush . . ." to be drug related names of strains of marijuana. [Ex-Husband] spoke to [Daughter] and she confirmed that Mother and Boyfriend were using and selling drugs.
>
> [CYS] submitted the [screenshot] of Mother's text message to [Daughter] into evidence. Phone records showed that the text message was sent to [Daughter] at 7:53 p.m. and that [Ex-Husband] called Mother at 8:45 p.m. to confront her and Boyfriend about what he perceived to be an offer of drugs to [Daughter]. [Ex-Husband] stated that Mother denied that she was using or in possession of any drugs and told [Ex-Husband] that [Daughter] used marijuana. [Ex-Husband] informed Mother of his intention to contact his attorney and the District Attorney's office. . . .
>
> The [trial c]ourt finds [Ex-Husband's] testimony regarding the text message, the implications of the text message and the conversation with Mother credible. While [Ex-Husband] was noticeably angered, even at the hearing, by Mother's actions, his

- 7 -

testimony was supported through a [screenshot] of the text message as well as phone records, which were entered into evidence by [CYS]. [Ex-Husband's] testimony was also supported by evidence that he did consult his attorney for advice on how to keep Mother from interacting with [Daughter]. In addition, contact was made with local law enforcement and [CYS].

Next, the [trial c]ourt heard testimony from [CYS caseworker] Joseph Petruna . . . .

Following [Ex-Husband's] report, [CYS] conducted an investigation and scheduled a meeting with Mother, Boyfriend and Boyfriend's brother on January 30, 2014. At the meeting[,] Mother offered an explanation for the text message. She asserted that [Daughter] is part of her support system and she wanted to share a success with her. According to Mr. Petruna, Mother characterized the incident as "somebody came by to peddle this stuff and she responded by showing him out and it was a strength of her recovery." Mother told Mr. Petruna that the text message to [Daughter] was not complete and that she was prevented by [Ex-Husband's] phone call from sending the second part of the message. [CYS] reviewed phone records provided by [Ex-Husband]. The records establish that the text was sent at 7:53 p.m. [Ex-Husband's] phone call did not occur until 8:45 p.m., 52 minutes later.

Mr. Petruna researched Purple Halo and Og Kush and confirmed that both are types of marijuana. . . . Mr. Petruna confirmed that a subsequent search of Mother's residence produced no illegal substances and that charges have not been filed against Mother or Boyfriend. After meeting with Mother, [CYS] continued to have safety concerns related to Mother's activities and judgment, even though Mother, who was being tested regularly by the Open Door, had not had a positive drug screen since February 2013.

Mother's testimony repeated what Mr. Petruna reported as her explanation at the January 30 meeting. Mother also testified as to her year of sobriety and pride in that accomplishment. According to Mother, "that was the first time that I have actually encountered drugs right in front of my face and not even [had] an inkling to do them." Mother wanted an acknowledgment of this accomplishment. Mother described [Daughter] as an

- 8 -

integral part of her support system. She said she celebrated recovery milestones with [Daughter]. Mother asserts that a phone call from [Boyfriend's Cousin] prevented her from sending a complete text message to [Daughter]. According to Mother[,] she was also speaking to another daughter [at the time]. Mother is not clear on the exact sequence[] because "it was such a mess with just all that going on all at the same time." With the help of Justice Works' staff, Mother was able to retrieve phone records to establish a chronology. Significantly, Mother did not offer these records into evidence to explain the 52 minute lapse between the alleged incomplete text message to [Daughter] and [Ex-Husband's] phone call. Also, although Mother describes [Daughter] as being an important person in her support system, [Daughter] did not appear and testify on Mother's behalf. During her testimony, Mother was reluctant to identify "Tom's guy" and had to be directed by the [trial c]ourt to respond. She claimed to only know this person's first name. Mother adamantly denied that she told [Ex-Husband] that [Daughter] smoked [marijuana]. In response to a question from the Guardian [A]d Litem, Mother explained that she shared the names of the marijuana in the text to [Daughter] because she thought they were "amusing and strange."

\* \* \*

The [trial c]ourt gives less weight to Mother's testimony than to the other witnesses. In reviewing the testimony of Mother, the [trial c]ourt does not find her explanation for the text message and events that transpired credible. A plain reading of the text message is that Mother is offering marijuana to [Daughter]. Her explicit mention of Purple Halo and OG Kush informed [Daughter] that the "new kinds of stuff he got sent from Colorado" was marijuana. The [trial c]ourt also believes that Mother's reference to "Tom's guy" in the present tense can be plainly read as a transactional and an on-going relationship between the Boyfriend and his supplier. While a search of Mother's residence yielded no illicit substances, this search occurred after Mother was told by [Ex-Husband] that he would contact law enforcement.

The [trial c]ourt believes it is entirely reasonable to find Mother less credible than the other witnesses. Mother had no sufficient explanation for why she did not complete the text message to [Daughter] in the 52 minutes that elapsed from the

time of the text until [Ex-Husband's] phone call. Mother could have provided substantiating evidence, such as phone records, or testimony from [Daughter], but failed to do so. [Daughter's] absence was especially glaring, since Mother considers her to be a crucial support person. As previously mentioned, a plain interpretation of the text points to a transactional relationship between Boyfriend and the person who came to the residence on January 9th. The text reads like an advertisement, mentioning, "new kinds of stuff", "from Colorado", and highlights the drug names. If it had truly been Mother's intent to demonstrate her commitment to sobriety, then the message should have conveyed the availability of drugs and a refusal to use. Instead, Mother's text reads as an offer of illicit drugs to her [Daughter], and it is rational to assume that such poor judgment on Mother's part establishes that in the 15 months that the Child has been in placement, Mother has not progressed to provide the Child with proper parental control and care.

(Trial Ct. Op., at 9-16 (citations omitted)).

We conclude that the trial court's findings are based on competent evidence in the record and, thus, reject Mother's argument, which would require this Court to revisit and essentially reverse the trial court in its credibility determinations. Accordingly, we discern no abuse of discretion on this issue.

In her second issue on appeal, Mother contends that the trial court committed an abuse of discretion in granting CYS's change of goal petition. (*See* Mother's Brief, at 11). Mother asserts that she consistently maintained full compliance with the permanency plan and points to the trial court's recognition of such in its opinion where it states, "there is no dispute that Mother was in full compliance with the permanency plan at each of her permanency review hearings[.]" (*Id.* at 15 (quoting Trial Ct. Op., at 18)). As further support, Mother notes, "despite the trial court's finding that CYS was having trouble getting Mother to schedule a drug test in February [2014], Mother testified that she was continuing to be tested at [t]he Open

Door, and the caseworker testified that as far as he was aware, [t]he Open Door had not received a positive drug screen since February 2013." (***Id.***). In addition, Mother argues that her text message to Daughter was insufficient evidence to support the trial court's decision to minimize Mother's progress towards reunification in light of the fact that a subsequent search of her residence produced no illegal substances and did not result in criminal charges being filed against her. (***See id.*** at 16-17). Ultimately, it is Mother's contention that the trial court committed an abuse of discretion in changing Child's permanency placement goal from reunification to PLC given Mother's asserted full compliance with the permanency plan in conjunction with "[CYS's failure] to produce any definitive evidence that Mother was engaged in an illegal activity." (***Id.*** at 17). We disagree.

In its opinion, the trial court explained the basis for its determination that Child's best interest necessitated that the permanency placement goal be changed from reunification to PLC, as follows:

> [W]hile [Mother] has consistently maintained full compliance [with the permanency plan], she has not progressed sufficiently during [C]hild's 15 months in placement. Mother had positive drug tests on January 30, 2013 and February 7, 2013. Boyfriend, who Mother resides with, also tested positive for cocaine during this time. While Mother achieved full progress at the January 16, 2014 hearing, this determination was made without consideration of the January 9th incident. Mother's progress at the April 10, 2014 hearing was downgraded to minimal because of the safety risk posed by her actions and poor judgment.
>
> As in ***In re S.B.***, 943 A.2d 973, 983 (Pa. Super. 2008), where the Court determined that although the natural parents had remained in full compliance with the permanency plan, it was still in the best interest of the child to grant a change of goal from reunification to adoption. In the instant case, Mother has

- 11 -

complied with the permanency plan, but has made insufficient progress to alleviate the issues that necessitated the original placement. Progress is the salient issue. In spite of Mother's involvement in services and treatment, she has had two positive drug tests, illicit drug activity at her residence, and demonstrated poor judgment. Following the January 16th [permanency review hearing], [] Mother did not respond to contacts from [CYS]. While in placement, the Child has achieved stability and academic success. [Child] is developing a relationship with her Father and expressed her wish to Father to remain with her foster family should she be unable to return to Mother. The [trial c]ourt has determined . . .

. . . that neither reunification nor adoption are appropriate goals for the Child at this time. . . . Mother has been unable to remedy the issues present at dependency to the standard that would allow for the health and safety of the Child. [PLC] is the appropriate goal to assure the [C]hild's safety, protection and physical, mental and moral welfare[.] [C]hild has flourished in placement. [Child's] grades and [school] attendance have improved and she has expressed a desire to remain with her foster parents, while continuing to visit and maintain a relationship with Mother. As Mother has demonstrated continued poor judgment and compelling, credible evidence of continued illegal activity in the home was presented to the [trial c]ourt, the [trial c]ourt finds that it is in the best interest of the Child to change the permanency goal from reunification to [PLC].

(Trial Ct. Op., at 18-20 (citations omitted)).

We find that there is competent evidence in the record to support the trial court's conclusion that, despite her substantial compliance with the permanency plan, Mother made insufficient progress toward alleviating the circumstances which necessitated Child's original placement. Accordingly, we agree with the trial court's determination that Child's best interests were served by changing Child's permanency placement goal from reunification to PLC and we discern no abuse of discretion on the part of the trial court in so ordering.

Order affirmed.

- 12 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/7/2014