J-A12005-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3351 EDA 2024 |

Appeal from the Order Entered November 19, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No:  CP-51-DP-0000154-2023

BEFORE:  STABILE, J., SULLIVAN, J., and LANE, J.

MEMORANDUM BY STABILE, J.:                    **FILED AUGUST 21, 2025**

Mother, L.P., appeals from the November 19, 2024, order entered in the Court of Common Pleas of Philadelphia County changing the placement goal of I.P. ("Child") (born 11/2012) from reunification to permanent legal custody ("PLC"), and awarding PLC of I.P. to Maternal Grandmother.  After careful review, we affirm.

We glean the factual and procedural history from the certified record. On December 27, 2022, the Philadelphia Department of Human Services ("DHS") received allegations that Mother and Father, J.M.,[1] were in a physical altercation that required Father to seek treatment at the hospital.  ***See*** Dependency Petition, 3/7/23, ¶ 5(b).  Father took I.P.'s sibling, X.P.-M. to the hospital with her.  ***Id.***, ¶ 5(c).  Mother called police and accused Father of kidnapping X.P.M.  ***Id.***  Police arrived at the hospital and took custody of X.P.-

_____

[1] Both Mother and Father use she/her pronouns.

M. *Id.* DHS received further allegations that Mother was diagnosed with bipolar disorder and had a history of substance abuse. *Id.*, ¶ 5(f).

DHS subsequently learned that Maternal Grandparents had primary custody of I.P. and X.P-M. through an informal family agreement. *Id.*, ¶ 5(e). On February 21, 2023, during a home visit at Maternal Grandmother's home, DHS witnessed an argument between Mother and Maternal Grandmother. *Id.*, ¶ 5(h). Maternal Grandmother told Mother she had to leave the house, and Mother responded that she was taking I.P. and X.P-M. with her. *Id.* I.P. refused to leave and became hysterical, crying uncontrollably and stating that she wanted to remain with Maternal Grandparents because she felt safe. *Id.* As a result, DHS was awarded protective custody of I.P. and, at a shelter care hearing, the court determined I.P. should remain in the care and custody of the agency. *See* Order of Protective Custody, 2/22/23.

I.P. was adjudicated dependent on May 10, 2023, and placed in kinship care with Maternal Grandmother. The court established a permanency goal of reunification. Mother was required to complete an immediate drug screen and three random drug screens prior to the next court date. She was also referred to the Achieving Reunification Center ("ARC") for assistance with housing, employment, and domestic violence issues. Mother was permitted weekly supervised visitation by DHS, while Father was permitted liberal unsupervised visitation, including weekends.

At a permanency review hearing on June 13, 2023, Mother was found to be in moderate compliance with her permanency goals. She obtained

employment and had three drug screens that were positive for marijuana. Mother was ordered to complete an immediate drug screen, participate in an assessment, and take four random drug screens prior to the next court date. She was again referred to ARC for assistance with housing and parenting classes. The court further ordered family therapy with Mother, Father and I.P. to begin when appropriate.

The next permanency review hearing was held on August 22, 2023. Mother was in moderate compliance with her permanency goals and made substantial progress alleviating the circumstances which necessitated the placement. The placement goal remained reunification. Mother was awarded unsupervised and supervised visitation at I.P.'s discretion. She was referred to both the Clinical Evaluation Unit ("CEU") and BHS for monitoring and three random drug screens if unable to obtain them from Mother's treatment provider. The court further ordered Mother to begin a parenting program and to follow-up with Courdea for assistance with domestic violence issues. Father's visitation was modified to include weekend overnights, and I.P. could be reunited with Father after four successful overnight visits.

After two continuances, the next permanency review hearing was held on January 18, 2024. Mother was in moderate compliance with her permanency goals and made minimal progress towards alleviating the circumstances which necessitated placement. The placement goal remained reunification. Mother was ordered to complete an immediate drug screen, three random drug screens prior to the next court date, and to be monitored

by CEU. She was further ordered to self-refer for domestic violence, parenting and anger management classes.

On January 16, 2024, DHS petitioned to change the permanency goal from reunification to permanent legal custody. Three hearings were held on June 11, September 3, and November 19, 2024. Initially, I.P. stated that she wanted to remain with Maternal Grandmother until Mother and/or Father found a new home, and then she wanted to live with them. N.T. Hearing, 6/11/24, at 6. There was no reason, other than a lack of appropriate housing, why I.P. would not want to live with Mother and/or Father. *Id.* at 7. While I.P. expressed that Mother no longer "beats" her and has "changed," I.P. preferred to live with Father.[2] *Id.* at 10-11.

In June 2024, Jordan DiVito, former Community Umbrella Agency ("CUA") case manager, believed Mother was moderately compliant with her permanency goals and made minimal progress alleviating the circumstances which necessitated placement. *Id.* at 21. One of Mother's permanency goals was to attend family therapy. I.P. stated that she attended family therapy with Maternal Grandmother, and Mother and Father only attended once. *Id.* at 7. Ms. DiVito believed Mother, Father, Maternal Grandmother, and X.P-M. were involved in family therapy, and that Mother was attending. *Id.* at 15, 21. She did not have any updates on how therapy was progressing. *Id.* at

---

[2] I.P. was not residing with Father in June 2024 because the home only had two bedrooms, which were occupied by Father and X.P.-M. N.T. Hearing, 6/11/24, at 25. Father was searching for a three-bedroom home so that I.P. could have her own room. *Id.*

8.  The therapist's records indicated that the last session was on April 29, 2024, and included a notation that the family was transferring to a new therapist. *Id.* at 27. No further information was provided at that time.

Mother was also directed to self-refer for domestic violence and parenting classes. She failed to do so. *Id.* at 17-18. Mother also stopped attending her dual diagnosis treatment, with her last session on October 11, 2023. *Id.* at 18. Mother was further ordered to complete several drug screens. Although Mother failed to complete three of the last four drug screens, Ms. DiVito testified that she did not have any concerns with Mother being under the influence. *Id.* at 19. Mother did not have appropriate housing and was residing in a shelter at the time. *Id.* at 20. There were no concerns with the quality of the unsupervised visits between Mother and I.P. *Id.*

Maternal Grandmother testified that she was helping Mother, Father and I.P. until Mother and/or Father obtained appropriate housing, then I.P. would return to living with them. *Id.* at 30. Maternal Grandmother also revealed that Mother had moved back in with them two or three days prior to the June 11, 2024, hearing. *Id.* at 30-31.

At the conclusion of the hearing, the court held DHS's goal change petition in abeyance and the case remained status quo. *Id.* at 34. The court noted that I.P.'s preference was to live with Father, and the only barrier to that was Father obtaining new housing. *Id.* at 37. The court ordered Mother to comply with domestic violence and parenting classes and complete an immediate drug screen and four random drug screens before the next court

date.  *Id.* at 37-38.  The court further noted its concern that Mother became irate and when the court advised Mother that her language was unacceptable, she left the courtroom.  *Id.* at 35-36.

By the next hearing on September 3, 2024, Brieyanna Wilson, current CUA case manager, testified that I.P.'s feelings on reuniting with Father changed, primarily because Mother and Father's relationship soured.  N.T. Hearing, 9/3/24, at 7-8.  I.P. was not spending as much time with Father anymore because Mother and Father were unable to coparent.  *Id.* at 7.  This was also due to I.P. and Father wanting to "keep the peace" to avoid a negative reaction from Mother.  *Id.* at 18.  After a few hours with Father, I.P. would contact Mother or Maternal Grandmother to be picked up.  *Id.*

Mother was still residing with Maternal Grandmother and I.P.  *Id.* at 10. She reported to Ms. Wilson that she found housing, but did not send over the information for Ms. Wilson to help Mother obtain grants.  *Id.* at 12.  Regarding her objectives, Mother still had not completed domestic violence classes but had completed parenting classes.  *Id.* at 11-12.  She was engaged in family therapy.  *Id.* at 11.  Mother took two of three random drug screens, both of which were positive for marijuana and opiates.  *Id.* at 13.  She did not complete a drug and alcohol assessment and reported to Ms. Wilson that she could not be accepted into the program because she was not presenting with a "dirty" urine.  *Id.* at 15.  When Ms. Wilson asked for documentation to that effect, Mother failed to provide it.  *Id.*  Accordingly, Ms. Wilson rated Mother's compliance as moderate.  *Id.* at 16.

Father obtained new housing but had not moved in by the time of the hearing, and DHS was unable to assess the home. *Id.* at 15-16. Additionally, Ms. Wilson reported that Father was now apprehensive about I.P. residing with Father because of the difficulties in her relationship with Mother. *Id.* at 15. Father indicated that she was still willing to care for I.P. full-time but wanted to ensure there were precautions in place for any custodial exchanges. *Id.* at 16.

At the conclusion of the hearing, the court awarded Maternal Grandmother temporary legal custody and scheduled a final hearing on DHS's goal change petition. *Id.* at 25-26. Mother was ordered to (1) self-refer to Courdea for domestic violence classes; (2) obtain a consultation and/or assessment from BHS; (3) obtain an assessment from CEU; (4) engage in drug and alcohol treatment; (5) continue family therapy; and (6) complete four random drug screens. *Id.* at 27.

The final hearing was held on November 19, 2024. The testimony from both June 11 and September 3, 2024, were incorporated. N.T. Hearing, 11/19/24, at 4. I.P. testified that she preferred to live with Mother because Mother proved that I.P. could trust her. *Id.* at 30. I.P. had one family therapy session with Mother since the last court and it went very well. *Id.* at 30-31. I.P. expressed wanting to stop therapy because there was nothing left to cover.[3] *Id.* at 31. Mother no longer hit I.P. as a form of discipline, and I.P.

---

[3] Ms. Wilson reached out to I.P.'s therapist but had not heard back by the time of the hearing. *Id.* at 12.

was no longer afraid that Mother would hit her. *Id.* I.P. explained that when she gets in trouble now, Mother will talk to her and handle it calmly. *Id.* at 32.

Ms. Wilson reported that I.P. continued to reside with Maternal Grandmother and Mother. *Id.* at 8-9. Mother reported to Ms. Wilson that I.P. was not doing well in school; however, Ms. Wilson did not request I.P.'s school records prior to the hearing. *Id.* at 9.

Regarding her ongoing objectives, Mother did not self-refer for anger management classes and stated she was not going to because it would get her fired. *Id.* at 15. Ms. Wilson testified that anger management was necessary for Mother to complete, particularly given that there was a verbal altercation outside of the courtroom immediately prior to the November 19, 2024, hearing. *Id.* at 15-16. Ms. Wilson explained that "Mother is easily frustrated and unable to control herself or to calm herself down at times." *Id.* at 16. Mother became upset when Ms. Wilson explained the purpose of the hearing and stated that nobody else would have custody of her children. *Id.*

Ms. Wilson sent Mother for three random drug screens, and each time Mother gave her an excuse as to why she could not do them. *Id.* at 17. At some point during the hearing, Ms. Wilson explained that "anger management" and "domestic violence counseling" were interchangeable. *Id.* at 18. Regardless of how DHS labeled it, Mother did not complete anger management or domestic violence classes.

Mother purportedly obtained housing and was scheduled to move out of Maternal Grandmother's home on December 1, 2024. *Id.* at 20. However, Mother did not provide the address or any information about the living arrangements; therefore, DHS was unable to assess the home. *Id.* at 20-21. Mother's compliance with her objections and progress toward alleviating the circumstances which necessitated placement were rated minimal. *Id.* at 19-20. As such, Ms. Wilson recommended that PLC be awarded to Maternal Grandmother but noted that was not what I.P. wanted. *Id.* at 13.

Although Father was set to move into a three-bedroom home, Father ultimately did not because I.P. expressed that she no longer wanted to live with Father, and Father did not want Mother to know her new address. *Id.* at 22. I.P. was not seeing Father at that time to "keep the peace." *Id.* at 23-24. Custody exchanges often became contentions, so I.P. and Father opted to maintain contact via telephone. *Id.* At the end of the hearing, the court awarded PLC to Maternal Grandmother and set a custody schedule for Mother and Father.

This appeal followed. Both Mother and the juvenile court have complied with Pa.R.A.P. 1925. Mother raises a sole issue for our review:

> Did the trial court err as a matter of law and abuse its discretion by changing the permanency goal of I.P. from reunification to permanent legal custody in the absence of clear and convincing evidence that such a goal change would be best suited to I.P.'s safety, protection and physical, mental and moral welfare?

Mother's Brief at 3.

The Juvenile Act governs the placement and custody of a dependent child and empowers a juvenile court to award permanent legal custody as a permanency option for a dependent child. ***See*** 42 Pa.C.S.A. § 6351(a)(2.1). We review an order regarding a dependent child's placement goal for abuse of discretion, and we are guided by the following:

> When reviewing such a decision, we are bound by the facts as found by the trial court unless they are not supported in the record. Furthermore, in a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interest and not those of his or her parents.
>
> At each review hearing concerning a child who has been adjudicated dependent and removed from the parental home, the trial court must consider: the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.
>
> **These statutory mandates clearly place the trial court's focus on the best interests of the child.**
>
> . . . We review for an abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and the witnesses.

***Interest of H.V.***, 37 A.3d 588, 593 (Pa. Super. 2012) (citation omitted; emphasis added). "Bonding between the child and his or her biological parents and foster parents is a factor to be considered in determining the child's best

interests." *Id.* at 594-95. To award PLC, DHS must merely prove that neither reunification nor adoption is best suited to the child's safety, protection, and physical, mental, and moral welfare. *In re S.H.*, 71 A.3d 973, 980 (Pa. Super. 2013). The court does not engage in the heightened review standard of clear and convincing evidence applicable to termination cases. *Id.*

Noting the "highly deferential standard" we afford to a dependency court, we reiterate that:

> We are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of success of the current permanency plan. Even if an appellate court would have [reached] a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*Interest of K.C.*, 310 A.3d 296, 306 (Pa. Super. 2023).

Permanent legal custody is a statutorily created program that permits a juvenile court to award PLC to a child's caretaker pursuant to 42 Pa.C.S.A. § 6351(a)(2.1).[4] *S.H.*, 71 A.3d at 977. "This is an arrangement whereby a

_____

[4] "If the child is found to be a dependent child the court may . . . transfer permanent legal custody to an individual resident in or outside the Commonwealth, including any relative, who . . . is found by the court to be qualified to receive and care for the child. A court order under this paragraph may set forth the temporary visitation rights of the parents." 42 Pa.C.S.A. § 6351(a)(2.1).

juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis, to a custodian. **Parental rights are not terminated**.” *Id.* (emphasis added). The addition of PLC to the Juvenile Act was the result of the enactment of the Adoption and Safe Families Act (ASFA) of 1997:

> The ASFA was Congress' response to the concerns of foster care drift and unsafe and unstable reunification efforts. Under the ASFA, states must hold permanency planning hearings within 12 months of the date a child enters care, and then every 12 months thereafter, to review and approve the permanency plan for the child. If a determination is made by the court that 'reasonable efforts' to reunite the child with a parent are no longer required, a permanency planning hearing must be held.
>
> In those cases where reunification is not appropriate, adoption is viewed as providing the greatest degree of permanence. In some situations, however, adoption may not be a realistic or appropriate option. For example, some older children, who are well familiar with and have affection for their parents, may object to termination proceedings. . . . Consequently, in those cases, attention may be focused on alternative permanency options such as guardianship, or custodial arrangements (PL[C]), preferably with relatives.

*Id.* at 978 (citations omitted). The policy underlying the Juvenile Act is to prevent children from languishing in foster care indefinitely, with its inherent lack of permanency and long-term parental commitment. *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006). Thus, the focus of dependency proceedings, including goal change proceedings is on the child:

> The state's interest in preserving family unity must be weighed along with the state's interest in protecting children, and a child's right to a healthy and stable environment. A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1276-77 (Pa. Super. 2003) (citations omitted).

By using the word "permanent," the legislature intended to end supervision of the child by the county agency and discontinue period reviews in juvenile court. ***S.H.***, 71 A.3d at 978-79. "This language does not confer or divest parents of any substantive rights but rather addresses the proper venue for visitation and support matters following the grant of a [PLC] arrangement." ***Id.*** Allowing parents to retain the right to petition for custody of their child even after an award of PLC underscores the non-permanent nature of this arrangement and its recognition of the parent-child bond.

On appeal, Mother argues that analysis of the factors enumerated in 42 Pa.C.S.A. § 6351(f) favors maintaining reunification as the permanency goal. Appellant's Brief, at 13. She contends that the court improperly relied upon "an inference that Mother posed a safety threat to I.P. because Mother struggled to contain her frustration during the November 19, 2024, hearing." ***Id.*** at 14-15. Mother claims there was no evidence of inappropriate discipline and, in fact, I.P. testified that Mother ceased the inappropriate discipline. ***Id.*** at 14, 16. "The missing completion of anger management classes, random drug screens and evaluation for drug and alcohol treatment does not warrant a rule out of reunification as a feasible and appropriate permanency goal for I.P." ***Id.*** at 16. Lastly, Mother argues that the court failed to expressly consider I.P.'s bond with Mother and her desire to reunify with Mother. ***Id.*** at 16-17.

In awarding PLC to Maternal Grandmother, the court explained:

I'm not reunifying [I.P.] with Mother. This case came in because of allegations of inappropriate discipline by Mother as to [I.P.]. . . . I actually adjudicated [I.P.] and her brother on May 10, still over a year. The issues were drugs and alcohol for [Mother], anger management for [Mother], and we're at the same place.

\* \* \* \*

[Mother]'s still testing positive. Let me be clear, if it was just marijuana, I would not be concerned, so that's one issue, probably the smaller of the two issues is that [Mother]'s still testing positive for drugs. The bigger issue for me is the anger management, which presumably led to the inappropriate discipline of [I.P.] when she was with [Mother] and [Father] at that time.

Now, I understand [I.P.] is saying that she has lived with [Mother] but that's not quite accurate. She's been living with [Mother], her grandmother and grandfather, and that's not the same as living directly with [Mother].

CUA expressed to me an issue that just occurred today with [Mother], anger management and even as I sit here today rendering my decision Mother is struggling to manage her anger as she's continuing to murmur and express frustration under her breath . . . to my decision. Quite frankly, [Mother] is Exhibit A as to why I'm not willing to reunify because if she cannot manage her anger enough in front of the court with a sheriff in the room because she doesn't like the decision[,] I have no reason to believe that [I.P.] would be safe, and I would be derelict in my duty.

\* \* \* \*

-- [Mother], her rights are not being terminated so at some point – as I look [at] [Father], [Father]'s checked out because of the constant anger management issues with [Mother]. And so [Mother]'s rights are not being terminated, so this order will go over to domestic relations side with Maternal Grandmother having . . . physical and legal custody of [I.P.].

- 14 -

The visitation is [Mother] will have unsupervised visits. I have no concern that for short periods of time [I.P.] would be safe in [Mother]'s care. It is the . . . day in, day out, [I.P.]'s 11, she's got 7 more years to be a kid, and kids frustrate parents, and when parents have poor anger management tolerance, that's how kids come back into my courtroom as near fatalities, and I'm not willing to sign off on it.

N.T. Hearing, 11/19/24, at 34-36.

Considering our standard of review and applicable case law regarding goal change hearing, we discern no abuse of discretion. I.P. was removed from the home primarily due to inappropriate discipline by Mother, which was fueled by her anger management issues. Mother never completed anger management or domestic violence classes and adamantly refused to engage in them because she would lose her job.

Initially, I.P. preferred to live with Father, but problems surfaced after Mother moved into Maternal Grandmother's home. Mother and Father's relationships soured due to Mother's anger which caused issues with coparenting. Mother's anger issues also caused I.P.'s relationship with Father to deteriorate. By the November 19, 2024, hearing, I.P. and Father were only communicating by telephone because they wanted to "keep the peace" with Mother. I.P. went from wanting to reside with Father to virtually having no relationship with Father after Mother began residing with I.P. and Maternal Grandmother.

Moreover, prior to the start of the November 19th hearing, Mother got into a verbal altercation with DHS staff while I.P. was present. When DHS informed Mother about the purpose of the hearing, she became upset and

started screaming that no one would take her children away from her. More telling, immediately after the court awarded PLC to Maternal Grandmother, Mother stated: "Come on, [I.P.], because you coming with me. I gotta order your bed for your room. Nobody going to know that you don't got unsupervised visits. You're coming with me." *Id.* at 37.

The court considered I.P.'s preference to live solely with Mother. However, the court noted that while I.P. testified that Mother no longer used inappropriate discipline while living in Maternal Grandmother's home, it could not guarantee the same if I.P. was only living with Mother. There was no evidence that Mother provided care for I.P. during the six plus months she resided with Maternal Grandmother and I.P. Moreover, Mother claimed that she was moving out of Maternal Grandmother's home but refused to provide her address or any information on living arrangements to DHS.

While the court did not explicitly state that it considered the bond between I.P. and Mother, the award of permanent legal custody acknowledges that there is a bond and that it would be detrimental to I.P. to sever parental rights. PLC provides stability and permanency to I.P. while allowing her to maintain her bond with Mother and continue to work on her relationship with Father.

Accordingly, the court did not abuse its discretion when it changed the permanency goal to PLC because it determined neither reunification nor adoption was in the best interests of I.P. *S.H.*, *supra*. The evidence supports the court's inference that Mother's anger management issues continued to

pose a safety threat to I.P. and that the circumstances which necessitated placement had not been alleviated.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>8/21/2025</u>