J-S22031-25

2025 PA Super 200

IN THE INTEREST OF: R.F., A MINOR  :  IN THE SUPERIOR COURT OF
 :  PENNSYLVANIA
 :
APPEAL OF: K.H., MOTHER  :
 :
 :
 :
 :
 :
 :  No. 227 MDA 2025

Appeal from the Order Entered January 28, 2025
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s):  CP-21-DP-0000084-2023

IN RE: R.F., A MINOR  :  IN THE SUPERIOR COURT OF
 :  PENNSYLVANIA
 :
APPEAL OF: K.H., MOTHER  :
 :
 :
 :
 :
 :
 :  No. 236 MDA 2025

Appeal from the Decree Entered January 27, 2025
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  073-ADOPT-2024

BEFORE:   LAZARUS, P.J., BOWES, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:      **FILED: SEPTEMBER 10, 2025**

K.H. ("Mother") appeals from the decree entered by the Court of Common Pleas of Cumberland County involuntarily terminating her parental rights to her son, R.F., born in August 2018.[1]  Mother also appeals from the

---

[*] Former Justice specially assigned to the Superior Court.

[1] The parental rights of R.F.'s biological father, also R.F. ("Father") (collectively with Mother, "Parents"), were also terminated by separate decree on the same date.  Father did not appeal or participate in this appeal.

orphans' court's order that changed R.F.'s permanency goal from reunification to adoption. After careful review, we vacate the termination decree, reverse the goal change order, and remand with instructions.

On May 18, 2023, the Cumberland County Office of Children and Youth Services ("CYS") received a general protective services report regarding concerns about Parents' substance abuse and that the local police "drug task force" were investigating Parents "due to concerns of selling and delivering drugs and paraphernalia." Notes of Testimony (N.T.), 1/7/25, at 107. Officers discovered methamphetamine and "other controlled substances" in Parents' home where R.F. resided. Recommendation for Adjudication and Disposition, 10/5/23, at 1. During the Agency's investigation, Mother tested positive for methamphetamine and fentanyl. *See id.* Thereafter, the Agency implemented a safety plan where R.F., who was then four years old, was placed with C.F. ("Paternal Grandmother").

The safety plan remained in place until the orphans' court adjudicated R.F. dependent on October 2, 2023. Upon adjudication, the court transferred R.F. to a foster care placement, where he remained until December 2, 2024. At that time, the court again placed R.F. with Paternal Grandmother, who is a pre-adoptive resource.

The orphans' court initially established R.F.'s permanency goal as reunification. In furtherance of that goal, Mother was ordered to, *inter alia*: (1) complete a drug and alcohol evaluation and follow all recommendations;

- 2 -

(2) attend two drug screens per week at the Restorative Sanctions Office ("RSO"); and (3) attend weekly supervised visitation with R.F.

Mother attended a drug and alcohol evaluation in April 2024 that recommended outpatient treatment, and she complied. **See** N.T., 1/7/25, at 48, 114. When Mother was reevaluated in August 2024, she was recommended for intensive outpatient treatment, and she again complied. **See id.** at 41, 49, 114. Mother's outpatient treatment was ongoing at the time of the subject hearings. **See id.** at 40.

With respect to the required drug screens, Mother tested positive for illegal drugs on the sporadic screens she attended from the date of R.F.'s adjudication through June 2024. **See id.** at 125-27. Mother largely failed to meet her drug testing requirements as the trial court noted that "out of the 83 weeks that Mother was to provide drug screen samples twice a week, Mother failed to do so 75 weeks out of those 83 weeks (unless ordered to do so in open court)." Orphans' Court Opinion (O.C.O.), 3/12/25, at 12-13 (unpaginated); N.T., 1/7/25, at 125-27.

Near the filing of the termination petition, Mother attempted to attend drug screening during a limited period of time from early September 2024 to late October 2024, which were largely negative.[2] N.T., 1/7/25, at 35-36.

_____

[2] Mother tested positive for marijuana four times during this period. **See** CYS Exhibit 7, at 23 (unpaginated). While Mother claimed she has a medical prescription for marijuana for opioid use disorder, the record confirms that only one of these positive tests occurred while her prescription was active. **See** N.T., 1/7/25, at 179-80.

However, Mother did not attend consistent screens from October 2024 through the subject hearings. *See id.* at 32-33, 38.

Mother did comply with weekly supervised visitation with R.F., which was generally held together with Father. *See id.* at 18-19, 21. The record reveals that the visits went very well. *See id.* at 18-20, 23, 82. R.F. looked forward to his visits, and he repeatedly expressed his desire to reunify with Parents. *See id.* at 82, 86-87; N.T., 1/24/25, at 63-64.

On October 9, 2024, CYS filed a petition requesting to change R.F.'s permanency goal to adoption. On November 4, 2024, CYS filed a petition seeking the involuntary termination of Mother's parental rights to R.F. pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

The orphans' court held evidentiary hearings on January 7, 2025 and January 24, 2025. At the first hearing on January 24, 2025, the Agency presented the testimony of the following witnesses: William Gilfus, Father's probation officer; Jennifer McWilliams, Parents' visitation supervisor from ABC House; C.F. ("Paternal Grandmother"); Elizabeth Hamilton, R.F.'s caseworker from KidsPeace Foster Care; and Ashley Vilkas, CYS caseworker. Mother testified on her own behalf and presented the testimony of Athena Stone, RSO public health technician who administers drug testing; and Miranda Mutzabaugh, Mother's substance abuse counselor from ARS Recovery Services of Camp Hill. At the second hearing on January 24, 2025, Father testified on his own behalf, and CYS presented additional testimony from Ms. Vilkas and Paternal Grandmother.

R.F. was age six at the time of the subject hearings. R.F.'s guardian *ad litem* ("the GAL"), Tammi Blackburn, Esquire, represented his best interests. Cindy Martin, Esquire ("legal counsel") represented his legal interests.[3]

By decree dated January 24, 2025, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). By order dated January 27, 2025, the orphans' court changed R.F.'s permanency goal to adoption.[4]

On February 21, 2025, Mother timely filed separate notices of appeal on R.F.'s respective dockets along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on March 12, 2025. This Court consolidated Mother's appeals *sua sponte* on March 26, 2025.

On appeal, Mother presents the following issues for our review:

1. Did the [t]rial [c]ourt err as a matter of law and abuse its discretion by terminating Mother's parental rights pursuant to

---

[3] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). **In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020). As R.F.'s legal interests were represented by separate counsel, the requirements of 23 Pa.C.S.A. § 2313(a) were met.

[4] Our review of the record shows that the parties were not given notice of the termination decree and permanency goal change order until January 27, 2025 and January 28, 2025, respectively. Our courts have recognized that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." **Int. of I.M.S.**, 267 A.3d 1262, 1263 (Pa.Super. 2021) (quoting **Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999)). We have changed the captions of the consolidated cases accordingly.

23 Pa.C.S.[A.] § 2511(b) in the absence of clear and convincing evidence that termination would best serve [R.F.]'s needs and welfare?

2. Did the [t]rial [c]ourt abuse its discretion by excluding relevant testimony and witnesses regarding circumstances that impacted Mother from November 2024 through December 2024?

3. Did the [t]rial [c]ourt abuse its discretion by granting []CYS' [petition] for a [g]oal [c]hange despite Mother's progress?

Mother's Brief at 5-6 (reordered for review).[5]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and

_____

[5] We note with displeasure that neither the GAL nor legal counsel filed respective briefs in this appeal.

permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007).

In her first issue, Mother argues that the orphans' court erred and abused its discretion when it terminated her parental rights pursuant to Section 2511(b). *See* Mother's Brief at 49-58. Specifically, Mother asserts that the orphans' court failed to analyze the bond between her and her son,

which our case law has long held is a necessary component of a child's emotional needs and welfare under Section 2511(b). *See Interest of K.T.*, 296 A.3d 1085 (Pa. 2023); *see also* 23 Pa.C.S.A. § 2511(b). As such, Mother asserts that the orphans' court was unable to conduct a proper analysis of Child's needs and welfare. We are constrained to agree. We only address this issue as it is dispositive of the appeal.

Section 2511(b) requires that orphans' courts "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has directed that a Section 2511(b) inquiry must include consideration of the bond between the parent and the child. *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has outlined the Section 2511(b) inquiry as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. **Thus, the court must determine each child's specific needs.**
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster

parents. **And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.**

**K.T.**, 296 A.3d at 1105-1106 (internal citations, quotations, and footnotes omitted) (emphasis added).

However, the Supreme Court further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." **Id.** at 1109. The "severance of a necessary and beneficial relationship [is] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." **Id.** at 1109-1110. Bond, permanency, stability, and all other intangible are "all of 'primary' importance in the Section 2511(b) analysis." **Id.** at 1109.

Instantly, the orphans' court reasoned with respect to Section 2511(b) that R.F.

> is not old enough or mature enough to understand best interest considerations and naturally at six years old he longs to live with his parents. Given the extensive period of time and services provided to the parents to demonstrate that they can safely reunify with R.F., and their inability to demonstrate the necessary progress towards achieving reunification, it is in R.F.'s best interest for . . . parental rights to be terminated and for his kinship parent to adopt him.

O.C.O. at 6, 16 (unpaginated).

However, the orphans' court failed to address the testimonial evidence in this case indicating that a parent-child bond may exist between Mother and R.F., and the effect that termination would have on him. Specifically, Ms. McWilliams, who supervised visitation between Parents and R.F., agreed that

- 9 -

the supervised visits were "overwhelmingly positive." N.T., 1/7/25, at 23. She testified that Mother has "given [the visits] her all" and praised Mother for "doing a great job" at visitation. *Id.* Further, Ms. McWilliams testified that when R.F. arrives at visits, "he will often give [Parents] hugs. Whenever he leaves, there's always lots of hugs and kisses and he wants group hugs and individual hugs." *Id.* at 19-20 (cited by Mother's Brief at 53).

In addition, Paternal Grandmother testified that R.F. is excited for supervised visits with Mother. *See id.* at 82. She likewise explained that the visits go well. *See id.* at 82. For instance, Paternal Grandmother testified that R.F. is "very positive when he comes out [of visitation]. There's always something he has to show me that they did together." *Id.* She testified that R.F. speaks about Mother, and that he "can't wait to call or see her" every week. *Id.* at 83-84. Indeed, Paternal Grandmother testified that R.F. loves Mother; that he desires to return home; and that he inquires about when he will go home.[6] *See id.* at 84, 86-87; N.T., 1/24/25, at 57. Paternal Grandmother testified that she thinks R.F. needs "more visits" with Mother. N.T., 1/7/25, at 79. The orphans' court did not address any of this evidence which reveals that a parent-child bond may exist. *See K.T.*, 296 A.3d at 1106 ("if the child has any bond with the biological parent, the court must conduct an analysis of the bond").

---

[6] In addition, legal counsel advocated for R.F.'s "adamant" desire to return home to Parents. N.T., 1/24/25, at 63-64.

Further, it is important to note that Paternal Grandmother also testified that it would be "detrimental" to R.F. if his contact with Mother ceased. N.T., 1/24/25, at 57, 62 (cited by Mother's Brief at 51). Specifically, she opined that severing all contact with Mother would cause R.F. to have "behavioral issues." *Id.* (cited by Mother's Brief at 51). The record reveals that R.F. has a history of behavioral issues in school over the course of his dependency and was awaiting continuation of services in his new school. *See* N.T., 1/7/25, at 95-96, 142. Moreover, Paternal Grandmother testified that, while she is willing to adopt R.F., she believes that "permanent legal custody" is the better option for him. *Id.* at 59-61. The orphans' court likewise did not address this testimonial evidence which is relevant to the effect that terminating Mother's parental rights would have on R.F. *See K.T.*, 296 A.3d at 1109-10 (an orphans' court must determine whether the child will suffer "extreme emotional consequences or significant, irreparable harm" from termination).

We conclude that the orphans' court abused its discretion by failing to evaluate the extent of R.F.'s bond with Mother and the effect that terminating this bond would have on him. *See K.T.*, 296 A.3d at 1109-10, 1114 ("to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial" and whether terminating parental rights would cause the child "extreme emotional consequences or significant, irreparable harm"). Therefore, we vacate the involuntary termination decree and remand to the orphans' court to review

the record or further develop it for purposes of conducting the requisite needs and welfare analysis under Section 2511(b).

As the orphans' court failed to conduct a proper needs and welfare analysis, we find this point to be dispositive of our analysis. **See M.E.**, 283 A.3d at 830 (Section 2511 requires a bifurcated analysis to grant involuntary termination); **see also** 23 Pa.C.S.A. § 2511(b) (the "primary consideration" of the bifurcated Section 2511 analysis is "the developmental, physical and emotional needs and welfare of the child").

In her final issue, Mother argues that the orphans' court abused its discretion when it changed R.F.'s permanency goal to adoption. **See** Mother's Brief at 23-28. Specifically, Mother similarly contends that the orphans' court did not adequately examine R.F.'s best interests. **See id.** at 25-28. We agree.

We likewise review orders changing a permanency goal for an abuse of discretion. **See In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). This Court has stated:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of the progress made toward alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the child; (5) a likely date by which the placement goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. . . .
>
> In relation to the significance of the best interest of the child, we also noted:

[T]he focus of all the dependency proceedings, including change of goal proceedings, must be on the safety, permanency and well-being of the child. **The best interest of the child takes precedence over all other considerations, including the conduct and the rights of the parent**. . . .

*In the Int. of J.B.*, 296 A.3d 1234, 1239 (Pa.Super. 2023) (internal citations omitted, brackets in original) (emphasis added). "Bonding between the child and his or her biological parents . . . is a factor to be considered in determining the child's best interests." *Interest of H.V.*, 37 A.3d 588, 594-95 (Pa.Super. 2012) (citation omitted). Moreover, "the burden is on the child welfare agency . . . to prove that a change in goal would be in the child's best interest." *In re R.I.S.*, 36 A.3d 567, 573 (Pa. 2011).

Given our conclusion that the orphans' court abused its discretion in failing to consider the nature and extent of R.F.'s bond with Mother in evaluating his best interests under Section 2511(b), we agree that the orphans' court erred in changing R.F.'s permanency goal to adoption. As stated above, Paternal Grandmother testified that, in her opinion, ceasing contact with Mother would be "detrimental" to R.F. N.T., 1/24/25, at 57, 59-62. Based upon the testimony, as a whole, recited above, we conclude that the orphans' court did not properly consider R.F.'s best interests in this case. *See H.V.*, 37 A.3d at 594-95; *J.B.*, 296 A.3d at 1239. Therefore, we reverse the permanency review order changing R.F.'s goal from reunification to adoption.

For the foregoing reasons, we vacate the decrees terminating Mother's parental rights, reverse the goal change order, and remand the case for the orphans' court to have an opportunity to hear evidence relevant to needs and welfare of the Child, including whether a bond exists between Mother and Child and the likely effect on Child of permanently severing such a bond. The orphans' court shall render a new decision.

Involuntary termination decree vacated. Dependency order reversed. Case remanded for proceedings consistent with this opinion to occur after receipt of the certified record, which we direct the Prothonotary to immediately remit. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/10/2025